Vacated and remanded for resentencing by published opinion. Judge GREGORY wrote the majority opinion, in which Senior Judge DAVIS joined. Senior
Judge DAVIS wrote a separate concurring opinion, and Judge WILKINSON wrote a dissenting opinion.
GREGORY, Circuit Judge:
This case presents the question of whether a federal inmate may use a 28 U.S.C. § 2255 motion to challenge a sentence that was based on the career offender enhancement under the United States Sentencing Guidelines when subsequent case law reveals the enhancement to be inapplicable to him. We find that he may, and in doing so hold that the mistake results in a fundamental miscarriage of justice that is cognizable on collateral review. For the reasons stated below, we grant a certificate of appealability, vacate the petitioner’s sentence, and remand the case for resentencing.
I.
The facts relevant to this appeal are brief and largely undisputed. In July 2009, the petitioner-appellant, Deangelo Whiteside, was indicted on charges of possession with intent to distribute at least 50 grams of crack cocaine, in violation of 21 U.S.C. § 841(a)(1). Shortly thereafter, the government filed an Information pursuant to 21 U.S.C. § 851 notifying Whiteside that it intended to seek an enhanced penalty based on a 2002 North Carolina felony drug conviction.
Whiteside then entered into a plea agreement with the government. The agreement acknowledged the possibility that Whiteside might be designated a career offender under U.S.S.G. § 4B1.1. It also contained several waivers of White-side’s rights to challenge his conviction and sentence in an appeal or collateral proceeding. As discussed in more detail below, the parties dispute whether these provisions bar Whiteside’s current claim.
*544 Whiteside pled guilty to the offense in October 2009 and the probation office began preparing a presentence report. The probation officer concluded that Whiteside was responsible for 1,951.9 grams of powder cocaine and 468.3 grams of crack cocaine, generating a base offense level of 32.[1] The probation officer also determined that a 1999 North Carolina conviction for felony possession with intent to sell and deliver cocaine, along with the 2002 drug conviction, qualified Whiteside for the career offender enhancement under § 4B1.1.[2] The enhancement raised White-side’s base offense level to 37 and his criminal history category from V to VI. After a three-level reduction for acceptance of responsibility, Whiteside’s Sentencing Guidelines range was 262 to 327 months in prison. In light of the government’s § 851 Information, the prior felony drug convictions also subjected Whiteside to a mandatory minimum term of imprisonment of twenty years.
Prior to Whiteside’s sentencing hearing, the government filed a § 5K1.1 motion seeking a downward departure based on the petitioner’s substantial assistance. The government recommended that White-side receive a sentence based on a total offense level of 32 and a criminal history category VI, which yielded a 210 to 262 month Guidelines range. The district court granted the government’s motion and, on July 9, 2010, sentenced Whiteside to 210 months’ imprisonment, a sentence below both his Guidelines range and the twenty-year mandatory minimum.
On August 17, 2011, this Court issued its en banc decision in United States v. Simmons, 649 F.3d 237 (4th Cir.2011). In Simmons, we overruled circuit precedent and held that a North Carolina conviction is a crime punishable by a term of imprisonment exceeding one year only when the defendant’s particular criminal history and the nature of his offense so warrant. See id. at 247 & n. 9. It is undisputed that under Simmons, Whiteside’s predicate convictions were not punishable by more than a year in prison, and were he sentenced today he would not be subject to either the career offender enhancement or the twenty-year statutory minimum penalty.
Whiteside argues that without those enhancements he would have faced a Guidelines range of 140 to 175 months and a statutory term of ten years to life. Assuming the same downward departure based on substantial assistance — eighty percent of the low end of the Guidelines— Whiteside contends that his sentence would have been 112 months, roughly eight years shorter than the sentence he received.
On May 18, 2012, Whiteside filed a 28 U.S.C. § 2255 motion to vacate his sentence. He argued that, in light of Simmons, he did not qualify as a career of *545 fender and that he should be resentenced without the enhancement.[3] The district court dismissed Whiteside’s motion to vacate, concluding that it was untimely, that Whiteside waived his right to collaterally attack his sentence in his plea agreement, and that he was not eligible for post-conviction relief because he received a sentence beneath the statutory maximum. The district court also declined to issue a certificate of appealability. This appeal followed.
II.
A.
We must first address whether Whiteside’s motion to vacate is procedurally barred. The first question on this point is whether Whiteside in his plea agreement waived his right to collaterally attack his sentence. We review this issue de novo. See United States v. Copeland, 707 F.3d 522, 528 (4th Cir.2013).
The relevant portions of Whiteside’s plea agreement are as follows:
20. Defendant, in exchange for the concessions made by the United States in this plea agreement, waives all such rights to contest the conviction except for: (1) claims of ineffective assistance of counsel or (2) prosecutorial misconduct. Defendant also ... knowingly and expressly waives all rights conferred by 18 U.S.C. § 3742 or otherwise to appeal whatever sentence is imposed with the two exceptions set forth above. Defendant also reserves right to appeal ruling as to career offender pursuant to USSG § 4B1.1.
21. Also, in exchange for the concessions made by the United States, defendant agrees that the United States preserves all its rights and duties with respect to appeal as set forth in 18 U.S.C. § 3742(b), while the defendant waives all rights to appeal or collaterally attack the sentence of conviction with the two exceptions set forth above.
The government contends that under these terms, Whiteside waived his right to collaterally attack his sentence on all grounds except that of ineffective assistance of counsel or prosecutorial misconduct. We disagree, finding that the language of the plea agreement is ambiguous and does not clearly specify which rights were waived.
In short, the paragraphs quoted above contradict one another. Paragraph 20 states that the defendant may challenge his conviction only on the two grounds just mentioned. It goes on to state that the defendant retains his right to appeal his sentence with respect to the career offender enhancement. However, paragraph 21 then states that he may only challenge his sentence (through either a direct appeal or § 2255 motion) on ineffective assistance or prosecutorial misconduct grounds. This simply does not make sense. Either the parties intended to limit the defendant’s right to challenge his sentence to two grounds, a result which would render the career offender reference at the end of paragraph 20 superfluous, or the statement in paragraph 21 limiting Whiteside’s rights to challenge his sentence to two grounds was a mistake and should instead have cited three possible bases for a challenge. Either reading is problematic, leaving it impossible to say exactly which *546 rights Whiteside waived. When a plea agreement is unclear, it must be construed against the government. See United States v. Jordan, 509 F.3d 191, 199-200 (4th Cir.2007). As such, we hold that Whiteside did not waive his right to challenge the career offender enhancement in a collateral proceeding.
B.
We next consider whether Whiteside’s motion to vacate was timely. A § 2255 petitioner ordinarily has one year from the date on which his conviction becomes final in order to file a motion to vacate. 28 U.S.C. § 2255(f)(1). White-side’s conviction became final on August 17, 2010, but he did not file his motion until May 18, 2012, well beyond the one-year period. However, the statute of limitations in § 2255(f)(1) may be equitably tolled in certain circumstances. Specifically, equitable tolling applies if the petitioner can show “ ‘(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way’ and prevented timely filing.” Holland v. Florida, 560 U.S. 681, 649, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418, 125 S:Ct. 1807, 161 L.Ed.2d 669 (2005)). Relief is limited to cases “where—due to circumstances external to the party’s own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result.” United States v. Sosa, 364 F.3d 507, 512 (4th Cir.2004).
As explained below, we find that the erroneous application of the career offender enhancement worked a gross miscarriage of justice. We also hold that Whiteside pursued his rights diligently by filing his motion within a year of our decision in Simmons and that extraordinary circumstances prevented him from filing the motion earlier. Our decision is based on the simple fact that our case law prior to Simmons absolutely foreclosed White-side’s current argument. In United States v. Jones, 195 F.3d 205 (4th Cir.1999), and then again in United States v. Harp, 406 F.3d 242 (4th Cir.2005), we rejected the arguments that we later accepted in Simmons. Had Whiteside filed a habeas petition prior to Simmons it would have been summarily denied on the basis of these decisions, as was the case for numerous other petitioners. See, e.g., Robinson v. United States, No. 5:07-cv140, 2011 WL 676184 (E.D.N.C. Feb. 18, 2011); Jordan v. United States, No. 1:09-cv-816, 2010 WL 2347076 (M.D.N.C. June 3, 2010). We think this condition—the complete lack of any chance at success—constitutes an “extraordinary circumstance” that warrants equitable considerations. The obstacle was clearly external to Whiteside—indeed, it was our incorrect interpretation of which North Carolina convictions support the career offender enhancement that prevented him from seeking relief. Once this was corrected and Whiteside had an opportunity for meaningful review, he filed his motion in a timely manner. This is not a case of a petitioner who has slept on his rights and later seeks relief from his indolence; instead, once Whiteside’s right to review obtained any real significance, he acted.
The government nevertheless contends that Whiteside should have filed his petition prior to Simmons in spite of its sure defeat. In addition to simply having an air of absurdity about it, this argument would lead to the perverse result of reading the AEDPA’s time limitations to encourage inmates to flood the courts with baseless petitions on the off chance that the law might one day change. Further, if White-side had filed his petition prior to Simmons and it had been denied, his current claim would possibly be barred as a sue- *547 cessive petition. See § 2255(h).[4] Given the timing of Whiteside’s conviction and our decision in Simmons, the result of the government’s position is that at no point would Whiteside have been entitled to relief from an error that we consider to be a fundamental miscarriage of justice. We cannot accept such an outcome.
Nor are we bound to. We recognize that we previously held that the futility of a petitioner’s claim does not constitute a circumstance external to his control. Minter v. Beck, 230 F.3d 663, 666 (4th Cir. 2000). However, our decision in Minter preceded the recent Supreme Court decision in Holland, which adopted an expansive reading of the role of equity in habeas cases. In Holland, the Supreme Court reviewed an Eleventh Circuit rule holding that attorney negligence in failing to meet a filing deadline may never serve as a basis for equitable tolling absent a showing of bad faith or dishonesty on the part of the attorney. 560 U.S. at 644, 130 S.Ct. 2549. The Court rejected this rule as overly rigid. Noting equity’s longstanding role in habeas relief, the Court stated that principles of equitable tolling are consistent with the “AEDPA’s basic purpose of eliminating delays ... without undermining basic habeas corpus principles and by harmonizing the statute with prior law, under which a petition’s timeliness was always determined under equitable principles.” Id. at 648, 130 S.Ct. 2549. In light of this, the Court held that the AEDPA’s statutes of limitations “do[ ] not set forth an inflexible rule requiring dismissal whenever’ its ‘clock has run.’ ” Id. at 645, 130 S.Ct. 2549 (quoting Day v. McDonough, 547 U.S. 198, 205,126 S.Ct. 1675,164 L.Ed.2d 376 (2006)). The Court further explained that, while courts of equity are of course governed by “rules and precedents,” equity also requires “flexibility” and the avoidance of “mechanical rules.” Id. at 649-50, 130 S.Ct. 2549 (internal quotation marks and citations omitted); see also id. at 650,130 S.Ct. 2549 (courts must “exercise judgment in light of prior precedent, but with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case”).
Although Holland dealt with attorney misconduct, an issue not before this Court, the decision’s broader point was that the “exercise of a court’s equity powers ... must be made on a case-by-case basis.... ” Id. at 649-50, 130 S.Ct. 2549; see also Jones v. United States, 689 F.3d 621, 626-28 (6th Cir.2012) (citing Holland and applying equitable tolling where inmate filed petition within three months of Supreme Court’s decision in Begay v. United States, 553 U.S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008), entitling him to relief). To the extent Minter created a bright-line rule that futility may not constitute an extraordinary circumstance, Holland requires that we at least apply such a rule on a case-by-case basis.[5]
*548 When examining the particular circumstances of Whiteside’s case, we find that he satisfies the requirements necessary for equitable tolling. He has successfully demonstrated that his sentence amounted to a fundamental miscarriage of justice. Correcting unjust incarcerations is the whole purpose of § 2255. As the Supreme Court explained in Holland, the AEDPA’s time limitations do not foreclose this relief to all those who are unable to meet the statute’s deadlines. Had Whiteside filed within the one-year statute of limitations, he likely would have been forced to suffer the injustice with no future chance at relief. The timing of our decisions should not be the sole determinant of a petitioner’s access to justice. Whiteside’s inability to obtain meaningful relief prior to our decision in Simmons is an extraordinary circumstance that warrants some flexibility on our behalf in order “to accord all the relief necessary to correct ... particular injustices.” Id. at 650, 130 S.Ct. 2549 (quoting Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 248, 64 5.Ct. 997, 88 L.Ed. 1250 (1944)).[6] Accordingly, we equitably toll the limitations period and review Whiteside’s claim.
III.
Turning to the merits of the case, we are asked to decide whether a petitioner may challenge his sentence on collateral review based on an incorrect application of the career offender enhancement. Because it is the only response that is both consistent with the realities of federal sentencing and just, we answer yes.
Section 2255 allows federal prisoners to move to set aside sentences that are imposed “in violation of the Constitution or laws of the United States.” Thus, § 2255 relief is not limited to constitutional errors. See Davis v. United States, 417 U.S. 333, 345-56, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). However, a non-constitutional error may only serve as a basis for collateral attack when it involves “a fundamental defect which inherently results in a complete miscarriage of justice.” United States v. Addonizio, 442 U.S. 178, 185, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979) (internal quotation marks omitted). The Supreme Court has provided only the general contours of what constitutes a complete miscarriage of justice. For example, in Hill v. United States, 368 U.S. 424, 429, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), the Court reviewed a sentencing judge’s failure to inform a defendant that he had the right to speak at his sentencing hearing. The Court characterized this mistake as a mere failure to follow the formal requirements of a rule, and held that it did not constitute a basis for habeas relief. Id.; see also Peguero v. United States, 526 U.S. 23, 119 *549 S.Ct. 961, 143 L.Ed.2d 18 (1999) (failure to inform defendant of the right to appeal where defendant knew of the right); United States v. Timmreck, 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979) (failure to mention a special parole term at Rule 11 hearing). In contrast, in Davis the Court held that a post-conviction change in the law that rendered the defendant’s conduct no longer criminal is correctable on collateral review because “[t]here can be no doubt that such a circumstance inherently results in a complete miscarriage of justice....” 417 U.S. at 346, 94 S.Ct. 2298 (internal quotation marks omitted).
Like a number of our sister circuits, we have held that “ordinary misapplication of the guidelines does not amount to a miscarriage of justice.” United States v. Mikalajunas, 186 F.3d 490, 496 (4th Cir.1999) (collecting cases); see also United States v. Pregent, 190 F.3d 279, 283-84 (4th Cir. 1999). However, we have not offered a considered explanation of what constitutes an “ordinary” Guidelines error as opposed to something more fundamental. In Mi-kalajunas, we held that an improper two-level enhancement for restraint of the victim did not amount to a complete miscarriage of justice. 186 F.3d at 496. In Pregent, we considered whether a defendant whose criminal history had been wrongly calculated resulting in a sentence four months too long was entitled to seek relief from the supervised release portion of his sentence. 190 F.3d at 283 & n. 4. Although we assumed that the error was cognizable on collateral review, we dismissed the defendant’s claim as untimely. We have not had occasion to address the specific issue presented in this case: whether the career offender enhancement is so significant that its improper application amounts to a fundamental miscarriage of justice.[7]
Three courts of appeals have, however, confronted this precise question, albeit with differing results. In Sun Bear v. United States, 644 F.3d 700 (8th Cir.2011) (en banc), the Eighth Circuit considered the question following the Supreme Court’s decision in Begay, which limited the category of defendants eligible for career offender status by narrowing the definition of a crime of violence. See 553 U.S. at 148, 128 S.Ct. 1581.[8] Sun Bear held that career offender status is an “ordinary question!] of [Guideline interpretation,” and that misapplication of this status is not an error that results “in a complete miscarriage of justice.” 644 F.3d at 704 (citation omitted).[9]
*550 The Seventh Circuit initially reached a different conclusion. In Narvaez, the court held that because of changes to the law under Begay and Chambers v. United States, 555 U.S. 122, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009), the defendant “never should have been classified as a career offender and never should have been subjected to the enhanced punishment reserved for such repetitive and violent offenders.” Narvaez, 674 F.3d at 627 (emphasis omitted). The court deemed the resulting career offender sentence a miscarriage of justice even though it fell beneath the applicable statutory maximum. Id. at 629. The court explained:
The imposition of the career offender status branded Mr. Narvaez as a malefactor deserving of far greater punishment than that usually meted out for an otherwise similarly situated individual who had committed the same offense. It created a legal presumption that he was to be treated differently from other offenders because he belonged in a special category reserved for the violent and incorrigible. No amount of evidence in mitigation or extenuation could erase that branding or its effect on his sentence. His designation as a career offender simply took as unchallenged a premise that was not true and gave him no way of avoiding the consequences of that designation.

Id.

Narvaez, however, dealt with a sentence issued prior to United States v. Booker, 548 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), when the Guidelines remained mandatory. Shortly after the Narvaez decision, the Seventh Circuit limited its holding to sentences issued under the mandatory Guidelines. See Hawkins v. United States, 706 F.3d 820, 824 (7th Cir.2013) supplemented on denial ofreh’g, 724 F.3d 915 (7th Cir.2013), cert. denied, — U.S. —, 134 S.Ct. 1280, 188 L.Ed.2d 299 (2014). In Hawkins, the court held that post-Booker, Guidelines errors were “less serious,” and that as long as the sentence imposed was beneath the statutory maximum it was not subject to correction on collateral review.
The Eleventh Circuit then reached the opposite conclusion of both the Eighth and Seventh Circuits. In a case that was recently vacated pending rehearing en bane, Spencer v. United States, 727 F.3d 1076, 1087 (11th Cir.2013), vacated pending reh’g en banc, (11th Cir. Mar. 7, 2014), the court stated that an erroneous career offender enhancement amounts to a fundamental miscarriage of justice because “categorization as a career offender is not merely a formal requirement of a criminal procedural rule.” This was true because, even post-Booker, “the Guidelines are the heart of the substantive law of federal sentencing.” Id. at 1087. Central to the panel’s reasoning was the Supreme Court’s recent decision in Peugh v. United States, — U.S.—, 133 S.Ct. 2072, 186 L.Ed.2d 84 (2013).
In Peugh, the Court held that retroactive application of a Guideline that increases a defendant’s applicable Guidelines range violates the Ex Post Facto Clause of the Constitution. Id. at 2084. In the process, the Court reaffirmed the important role that the Guidelines play in sentences issued post-Booker. The Court stated that the Guidelines remain “the lodestone of sentencing,” id., and that “[t]he post-Hoofcer federal sentencing scheme aims to achieve uniformity by ensuring that sen *551 tencing decisions are anchored by the Guidelines_” Id. at 2083 (emphasis added). The Court also noted the requirement that “ ‘district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.’ ” Id. (quoting Gall v. United States, 552 U.S. 38, 50 n. 6, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)). The Court explained that this and other hurdles “make the imposition of a non-Guidelines sentence less likely,” id. at 2083-84, and that an increase in the Guidelines range still creates a “significant risk of a higher sentence.” Id. at 2088. In support, the Court cited Sentencing Commission data showing that, absent a government motion for a variance, roughly eighty percent of defendants since 2007 have received within-Guidelines sentences. Id. at 2084.
Relying on the Supreme Court’s recent pronouncements and citing additional statistical data concerning the career offender enhancement, the Spencer panel held, “[w]e cannot pretend that, because of Booker, career offender status no longer matters to sentence length.” 727 F.3d at 1088. Instead, “an erroneous career offender Guideline calculation, even though advisory, ... can amount to a fundamental defect in the sentencing analysis.” Id. at 1088-89.[10]
We agree with the Spencer panel’s reasoning and hold that an erroneous application of the career offender enhancement amounts to a fundamental miscarriage of justice that is cognizable on collateral review. By no rubric can the impact of the career offender enhancement be considered “ordinary.” The Supreme Court has recognized that career offender status creates “a category of offender subject to particularly severe punishment.” Buford v. United States, 532 U.S. 59, 60, 121 S.Ct. 1276, 149 L.Ed.2d 197 (2001). And as cited in Spencer, Sentencing Commission data show the continued impact of the enhancement on sentences administered post-Booker. For example, in 2012, the mean sentence for criminal history category VI now-career offenders was 84 months and the median was 60 months. For career offenders, those figures increased to a mean of 163 months and a median of 151 months. For drug trafficking offenses, criminal history category VI non-career offenders received a mean sentence of 115 months and a median of 96 months; those figures jumped to 154 months and 144 months respectively for career offenders.
Whiteside’s case is representative of the enhancement’s dramatic impact. Absent the enhancement, he would have faced a Guidelines range of 140 to 175 months; after it was applied, his range skyrocketed to 262 to 327 months.[11] The district court eventually departed downward from this range to a period of 210 months; but that is exactly the point: the court departed downward from what was believed to be the applicable Guidelines range in fashioning the ultimate sentence. The Guidelines range, although advisory, retained its anchoring effect throughout Whiteside’s sentencing. It is just that the anchor was dropped in the wrong place. *552 The Supreme Court has recognized this effect, stating that “[e]ven if the sentencing judge sees a reason to vary from the Guidelines, ‘if the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, then the Guidelines are in a real sense the basis for the sentence.’” Peugh, 133 S.Ct. at 2083 (quoting Freeman v. United States, 564 U.S.-,-, 131 S.Ct. 2685, 2692, 180 L.Ed.2d 519 (2011) (plurality opinion)) (emphasis in original).
In Whiteside’s case, had the district court begun with the correct range, it almost certainly would have imposed a different sentence. Consider that if the court had employed the same twenty percent downward departure based on substantial assistance, Whiteside would have received a sentence of 112 months as compared to 210 months. And in the abstract, it is highly unlikely that any defendant with a Guidelines range of 140 to 175 months who has been granted a § 5K1.1 motion for a downward departure would receive a sentence 35 months in excess of the high-end of that range. At the very least, the § 3553 factors supporting such an increase would be subject to rigorous review under Gall on direct appeal.
It is not by accident that the career offender enhancement so significantly impacts defendants’ sentences. Unlike most of the Guidelines, which are based on the policy calculations of the Sentencing Commission, the career offender enhancement derives from a congressional requirement. A statute provides that “[t]he Commission shall assure that the [G’Juidelines specify a sentence to a term of imprisonment at or near the maximum term authorized” for those who qualify for the enhancement. 28 U.S.C. § 994(h). Heeding this charge, the Commission fashioned strict penalties for career offenders: their criminal history categories are automatically boosted to VI, the highest possible rung, and their offense levels become tied to the statutory maximum penalty as opposed to the actual conduct of conviction. See U.S.S.G. § 4Bl.l(b). Both factors contributed to the significant increase in Whiteside’s Guidelines range.
Clearly then, the impact of the career offender enhancement is far from ordinary. It is certainly nothing like the two-level enhancement for restraint of the victim which we rejected as a source of habe-as relief in Mikalajunas. That case presents a far better example of a garden variety Guidelines adjustment that, while possibly having an impact on the defendant’s sentence, cannot be said to constitute a fundamental miscarriage of justice. In contrast, an enhancement that casts the defendant as a hopeless recidivist worthy of the strictest possible punishment, and that has the effect of robbing a defendant of his freedom for some eight years, is fundamentally different.[12]
The government is certainly correct in remarking that this case does not present exactly the kind of error recognized by the Supreme Court in Davis. The petitioner in Davis was convicted for actions later deemed not criminal. 417 U.S. at 346, 94 S.Ct. 2298. The Court remarked that “[tjhere can be no room for doubt that such a circumstance inherently results in a complete miscarriage of justice.... ” Id. (internal quotation marks and citation *553 omitted). We reached a similar result in applying Simmons to vacate a felon-in-possession conviction in Miller. Here, the instant conviction for which Whiteside was sentenced remains valid. Regardless, though, Whiteside is almost certainly serving time he would not be absent the enhancement. The mere fact that he was properly convicted does not somehow excuse an obviously legally erroneous sentence.[13]
Nor does the fact that White-side was sentenced beneath the applicable statutory maximum mitigate the mistake. Contrary to the government’s contention, this fact alone does not make a sentence “lawful,” for several reasons. First, such a conclusion is contrary to our well-established principles of appellate review. While sentencing review is highly deferential, that “does not mean there is no review at all.” United States v. Abu Ali, 528 F.3d 210, 268-69 (4th Cir.2008). “If Gall had intended to dispense with any semblance of meaningful review, there would have been no need for the decision ... to direct district courts to ‘correctly calculate] the applicable Guidelines range.’ ” Id. at 265-66 (quoting Gall, 552 U.S. at 49, 128 S.Ct. 586). And when sentencing courts vary from the Guidelines, they must “consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.” Gall, 552 U.S. at 50, 128 S.Ct. 586. We have demonstrated our willingness to vacate non-Guidelines sentences that are unreasonable in light of the district court’s explanations. See, e.g., United States v. Engle, 592 F.3d 495, 505 (4th Cir.2010); Abu Ali 528 F.3d at 268-69.
Of course, these standards are utilized only on direct appeal. But they highlight the rigor with which we view our role in ensuring that each and every defendant sentenced in federal court receives a fair and reasonable sentence, to say nothing of a lawful one.
The animating principles of fundamental justice are no different here. First, through no fault of his own, Whiteside’s opportunity for such review did not arise *554 until after the period in which to file a direct appeal had lapsed. Had Whiteside challenged his career offender status on direct appeal, his argument would have been rejected by our pre-Simmons line of cases. See United States v. Harp, 406 F.3d 242 (4th Cir.2005); United States v. Jones, 195 F.3d 205 (4th Cir.1999). He should not be punished — and we mean literally punished, as in additional time spent in federal prison, time which the law does not countenance — for this fact. Acknowledging that a defendant would likely be entitled to a vacated sentence on direct appeal but not on a timely filed habeas motion simply due to the timing of one of our decisions contributes to the conclusion that denial of review operates a complete miscarriage of justice.
Second, the Supreme Court just last year told us that the advisory nature of the Guidelines does not cure the harm that results from utilizing an incorrect Guidelines range as a starting point. See Peugh, 133 S.Ct. at 2086; see also Spencer, 727 F.3d at 1087 (“The Seventh Circuit [in Hawkins] may think that mistakenly categorizing a defendant as a career offender became not very serious once Booker made the Guidelines advisory, but the Supreme Court told us in June ... that the Guidelines are still ‘the lodestone of sentencing.’ ” (quoting Peugh, 133 S.Ct. at 2084)) (citation omitted). In Peugh, the Court ruled that retroactive application of a Guideline violates the Constitution even when the vacated sentence is beneath the statutory maximum. The Court stated, “that a district court may ultimately sentence a given defendant outside the Guidelines range does not deprive the Guidelines of force as the framework for sentencing.” Peugh, 133 S.Ct. at 2076. And though Peugh concerned a direct appeal, it found error of constitutional magnitude, indicating that the mistake also would have been correctable on collateral review.
In addition to the continued vitality of the Guidelines in an advisory system, Peugh also drew on the principles of fairness and justice that animate the Ex Post Facto Clause. Id. at 2085 (“[T]he Clause also safeguards a fundamental fairness interest ... in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life.” (internal quotation marks and citation omitted) (ellipsis in original)); id. (“[The Clause] does not merely protect reliance interests. It also reflects principles of fundamental justice.”). We find that these principles map easily onto our analysis of whether Whiteside was subject to a fundamental miscarriage of justice. Because of the career offender enhancement, White-side’s sentence is plainly at odds with what he would receive were he sentenced today. He is not a career offender, and he should not serve a sentence that was based on his classification as one. The mere fact that his sentence was beneath the statutory maximum does not somehow assuage this fundamental unfairness.
In the face of this clear injustice, the government pleads that we respect — with something approaching sanctity — the finality of sentencing decisions. We agree that finality is an important consideration. It encourages defendants to accept their punishments and move forward with their lives; as well, it minimizes the misuse of judicial resources. Perhaps most importantly, in cases involving victims, finality offers these individuals some degree of peace of mind and a sense that their suffering has not been forgotten. But we do not agree that these considerations, to the extent that they apply here, can or should outweigh the plain injustice that would result from denying the petitioner what he seeks, which is only a chance to be sentenced according to the factors that every *555 one agrees should apply. Were we to conclude otherwise, we would be putting “bureaucratic achievement” ahead of our task of ensuring that all those who come before us receive meaningful review of their claims. Gilbert v. United States, 640 F.3d 1293, 1337 (11th Cir.2011) (Hill, J„ dissenting). We are more than mere gatekeepers. Congress has given us the authority on collateral review to relieve errors that amount to fundamental defects in process or justice. Erroneous application of the career offender enhancement works such an injustice, and we will not turn a blind eye to so obvious an error simply for the sake of finality.[14]
Because we find that Whiteside suffered a fundamental miscarriage of justice, we need not address his additional claim that the error violated his constitutional rights to due process. We have, however, considered the constitutional question to the extent necessary to grant a certificate of appealability, which has yet to issue in this case. See 28 U.S.C. § 2255(c) (permitting issuance of a certificate of appealability only where petitioner “has made a substantial showing of the denial of a constitutional right”) (emphasis added). A certificate of appealability may issue on a constitutional question that is “debatable.” Miller-El v. Cockrell, 537 U.S. 322, 337, 338, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). We are satisfied that, for the same reasons discussed above with regard to the fundamental defect/miscarriage of justice claim, it is at least debatable that erroneous application of the career offender enhancement deprived Whiteside of his liberty in violation of his due process rights. We therefore grant a certificate of appealability.[15]
IV.
For the reasons stated above, we hold that equitable tolling applies to Whiteside’s claim. We also hold that erroneous application of the career offender enhancement amounts to a fundamental miscarriage of justice that can be corrected on collateral review. We grant a certificate of appeala-bility, vacate Whiteside’s sentence, and remand the case for resentencing.

*556
VACATED AND REMANDED FOR RESENTENCING

. The probation officer disagreed with the government’s stipulation in the plea agreement that Whiteside would be held responsible for more than 50 and less than 150 grams of crack cocaine.

. The career offender enhancement defines a "career offender,” and provides that a defendant is such an offender if
(1) [he] was at least eighteen years old at the time [he] committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) [he] has at least two prior felony convictions of either a crime of violence or a controlled substance offense.
U.S.S.G. § 4Bl.l(a). For purposes of the enhancement, a "prior felony conviction” includes “a prior ... state conviction for an offense punishable by ... imprisonment for a term exceeding one year, regardless of whether such offense is specifically designated as a felony. ” Id. § 4B1.2 cmt. n. 1.

. Whiteside subsequently filed a supplement to his motion to vacate, making the same arguments, but seeking, in the alternative, relief under 28 U.S.C. § 2241, a writ of coram nobis, and a writ of audita querela.

. We expressly do not decide whether the savings clause in § 2255(e) might justify relief from a Simmons sentencing error through the filing of a § 2241 petition. While we have not previously "extended the reach of the savings clause to those petitioners challenging only their sentence,” United States v. Poole, 531 F.3d 263, 267 n. 7, 274 (4th Cir.2008), we note that the Eleventh Circuit recently permitted a federal inmate to use § 2255(e) to bring a § 2241 petition challenging the legality of his sentence. Bryant v. Warden, 738 F.3d 1253 (11th Cir.2013).

. Moreover, the factual differences in the cases aside, our outcome is entirely consistent with Holland. Indeed, the circumstances here are arguably more compelling, given that attorney errors are generally attributable to clients, see Holland, 560 U.S. at 656, 130 S.Ct. 2549 (Alito, J., concurring) (citation omitted), while this case deals with our own error in interpreting prior case law. There is *548 no similar justification for punishing a petitioner for our mistake.

. Indeed, even the government recognizes that on a case-by-case basis, Simmons relief should be afforded to some petitioners notwithstanding limitations or appeal waivers. See Mungro v. United States, Nos. 5:11-cv-141-RLV & 5:04-cr-18-RLV-CH-1, 2013 WL 6800822, at *6-*7 & n. 3 (W.D.N.C. Dec. 23, 2013) (granting § 2255 motion to vacate the prisoner’s mandatory life sentence on Simmons grounds, and noting that the government had waived "reliance on the statute-of-limitations defense”); Sturvidant v. United States, Nos. 3:12-CV-66-FDW & 3:09-cr-39-FDW-6, 2013 WL 6669025, at *1, *3 (W.D.N.C. Dec. 18, 2013) (granting Simmons relief after government "declined to enforce” the defendant's plea-agreement waiver of the right to collaterally attack his sentence). As the government apparently concluded in Mungro, we conclude that in this case "it would be unconscionable to enforce the limitation period against the [petitioner] and gross injustice would result” were we to do so. Minter, 230 F.3d at 667 (quoting Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir.2000) (§ 2254 case)).

. Our friend in dissent accuses us of running “roughshod" over circuit precedent. This is demonstrably not the case. Aside from the fact, explained below, that the career offender enhancement is plainly not a run-of-the-mill guideline, the dissent ignores the particulars of our prior cases. In United States v. Pettiford, 612 F.3d 270, 275 (4th Cir.2010), the petitioner filed a motion to vacate his Armed Career Criminal Act enhanced sentence following a state court vacatur of two of his predicate offenses. We denied the motion because it was undisputed that, following the vacatur, the petitioner still had three remaining ACCA qualifying convictions in his record. Id. at 276-77. Thus, our statement regarding the availability of collateral review to correct Guidelines errors was pure dicta. Likewise, as explained above, in Pregent we assumed that the petitioner had stated a cognizable claim before dismissing his petition as untimely. 190 F.3d at 284. Moreover, the petitioner in Pregent was arguing for the termination of the supervised release portion of his sentence, a far cry from the situation confronting Whiteside. Id. at 283.

. The court first acknowledged that Begay set forth a substantive rule that could be applied retroactively on collateral appeal. We need not consider this preliminary issue with respect to Simmons, since we have previously determined that Simmons announced a substantive rule that may be raised in a habeas proceeding. See Miller v. United States, 735 F.3d 141, 147 (4th Cir.2013).

. It is worth noting that the sentence imposed in Sun Bear was within the Guidelines range applicable even in the absence of the career offender enhancement. Id. at 705.

. After Peugh, the panel in Hawkins released supplemental opinions discussing Peugh's impact on its case. See 724 F.3d 915 (7th Cir. 2013). Disagreeing with the Eleventh Circuit, the court upheld its earlier decision that the advisory nature of the Guidelines prevented the petitioner from obtaining relief. Id. at 916-17.

. These figures put aside consideration of the statutory minimum penalty, which, of course, we also know was improperly applied in light of Simmons.

. The dissent faults us for failing to provide a "nonarbitraiy” line delimiting the types of sentencing errors that constitute "extraordinary circumstances.” Post at 561. Given the inherent folly of attempting to forecast the contours of "extraordinary” events, our review is quite properly limited to the case before us, and we decide only that when subsequent case law makes manifestly clear that a petitioner was wrongly designated a career offender he may challenge his sentence through a § 2255 motion.

. The dissent refuses to acknowledge the basic truth underlying our decision: that White-side is not, and was not, properly designated a career offender. Our sentencing regime prior to Simmons was overinclusive; it swept up defendants whose criminal histories, when viewed individually—a general bugaboo of the dissent—did not expose them to the enhancement. Simmons corrected this mistake by directing district courts to examine the specifics of the defendant’s predicate convictions. Under this approach, there is no question Whiteside should not have received the enhancement. Simply because a criminal defendant was at one point classified a career offender does not mean that classification was ever correct. Neither the Eighth nor Seventh circuits had any trouble recognizing that by narrowing the definition of the terms “crime of violence” and "violent felony,” Begay and Chambers exposed "errors" in how the Guidelines had been applied. See Sun Bear, 644 F.3d at 704; Hawkins, 706 F.3d at 823. The effect of Simmons on Whiteside’s case is no different. This point is underscored by our decision in Miller finding Simmons to have announced a new substantive rule retroactive on collateral review. 735 F.3d at 147. In Miller, we recognized that by "altering] 'the class of persons that the law punishes,’ ” Simmons had a dramatic impact on the substantive rights of criminal defendants. Id. at 146 (quoting Schriro v. Summerlin, 542 U.S. 348, 353, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004)). The Miller court had no hesitation in overturning the petitioner’s conviction—and his accompanying sentence of 72 months, potentially less time than Whiteside is wrongly serving—even though the conviction was originally consistent with controlling precedent. Id. at 143, 147. Given the continued importance of the Guidelines generally post-Booker, and the impact of the career offender enhancement in particular, there is no reason, in theory or in practice, to reach a different result here. At the very least, there can be no honest question that Whiteside’s designation as a career offender was in fact “erroneous.”

. Unfortunately, our dissenting colleague sounds the alarm that after today’s decision no criminal sentence is safe from collateral attack. The dissent's attempts to expand our holding on our behalf could only result from its larger, misguided goal of convincing the reader that habeas relief is somehow harmed by its utilization. Somewhat amazingly, the dissent is explicit on this point. Post at 569-70. With due respect to our colleague’s views, habeas review is not merely a deterrent that fulfills its purpose by its threatened use; criminal defendants are aided only when it is employed. The dissent would have its own exaltation of the history of the Great Writ and § 2255 relief contribute to the mechanism’s futility. Accusing us of Whig history, the dissent’s approach is rank with the fearful mistrust of individualized decision-making inherent to traditional conservatism. The suggestion that district courts and future panels of this court cannot discern actual injustices from less serious errors casts too critical an eye on the judges throughout our circuit. In short, we simply do not share the view that the criminal justice system is somehow harmed when defendants are sentenced according to a proper understanding and application of the law.

. Although Whiteside fashioned his due process claim on the Supreme Court’s decision in Hicks v. Oklahoma, 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980), we think any such claim more aptly derives from Simmons itself. For this reason, we need not address the government's position that the claim is barred by the non-retroactivity doctrine of Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (holding that new rules of criminal procedure may not be raised in post-conviction proceedings), since we have already held that Simmons announced a substantive rule that is applicable on collateral review. See Miller, 735 F.3d at 147.